IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DE WITT LAMAR LONG, #A1024631,<br><br>          Plaintiff,<br><br>    vs.<br><br>SGT. SUGAI, et al.,<br><br>          Defendants. | CIV. NO. 19-00235 JMS-RT<br><br>ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 65 |

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, ECF NO. 65

## I. INTRODUCTION

This case arises from pro se prisoner De Witt Lamar Long's ("Plaintiff") allegations that prison officials at the Halawa Correctional Facility ("HCF") violated his First Amendment rights while he was incarcerated there. The court previously screened Plaintiff's pro se Complaint, determining that individual capacity claims against three HCF officials—Sgt. Rodney Sugai, Sgt. Wyatt Lee, and Chief Lyle Antonio (collectively, "Defendants")—could proceed. ECF No. 6 at PageID # 41. Plaintiff alleges that each Defendant violated his right to freely exercise his religion by denying him access to religious meals and religious

services.  ECF No. 1 at PageID ## 8-10.  Plaintiff further alleges that Sgt. Sugai and Chief Antonio retaliated against him for using the prison grievance system to report Sgt. Sugai's alleged harassment.[1]  *Id.* at PageID ## 8-9.  Defendants now move for summary judgment as to all claims, ECF No. 65.  For the reasons set forth below, Defendants' Motion for Summary Judgment is DENIED as to all claims against Sgt. Sugai and the free-exercise claim against Chief Antonio but is GRANTED with respect to the retaliation claim against Chief Antonio and all claims against Sgt. Lee.

## II.  BACKGROUND

### A.    Factual Background

The following facts are presented in the light most favorable to the Plaintiff, both because he is the non-moving party and because, as a pro se prisoner, Plaintiff's summary judgment filings must be "construe[d] liberally." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010).

Plaintiff is a practicing Muslim.  ECF No. 1 at PageID # 8.  He was incarcerated at HCF from December 16, 2015 until June 29, 2017, when he was transferred to the Saguaro Correctional Facility ("Saguaro") in Eloy, Arizona.

---

[1] Prison grievances are intended to provide an administrative remedy process to address prisoner complaints related to any aspect of their confinement.  HCF has adopted a three-step grievance process, with a final decision at step 3.  For a more detailed description of this three-step process, *see Bolosan v. Tanigawa*, 2019 WL 3430764, at *3 (D. Haw. July 30, 2019).

ECF No. 75-1 at PageID # 446; ECF No. 75-33 at PageID # 503.  HCF is a Hawaii state correctional facility located in Aiea, Hawaii.  ECF No. 1 at PageID # 1.  Sgt. Sugai is an adult correctional officer ("ACO") at HCF.  ECF No. 66-2 at PageID # 403.  At all times relevant, Sgt. Sugai was responsible for the kitchen area at the Medium Facility ("MF"), the prison's general-population, medium-security facility.  ECF No. 66-4 at PageID # 410; ECF No. 66-1 at PageID # 399.  Sgt. Lee is also an ACO who, at all times relevant, worked in the Special Needs Facility ("SNF").  ECF No. 75-1 at PageID # 449.  The SNF is a high-security facility that houses all HCF inmates "who have certain conditions (i.e.[,] medical) or who have violated facility or department rules or policies," although some general population inmates are housed there as well.  ECF No. 65-1 at PageID # 375.  Chief Antonio was, at all times relevant, the Chief of Security at HCF.  ECF No. 66-4 at PageID # 409.  Chief Antonio had authority and discretion to transfer inmates between facilities at HCF.  *Id.* at PageID # 410; *see also* ECF No. 65-1 at PageID # 383.

### 1.   *Harassment at the MF*

Upon his arrival at HCF in December 2015, Plaintiff was placed in the MF.  ECF No. 65-1 at PageID # 377.  That same day, Plaintiff submitted a medical request, "respectfully requesting to be placed on a non-[p]ork diet list" so that he would be able to eat in accordance with his Islamic faith while imprisoned at HCF.  ECF No. 75-10 at PageID # 480.  The HCF Medical Unit responded on December

17, informing Plaintiff that he needed to submit his religious diet request to the prison Chaplain, *id.*, which Plaintiff proceeded to do on December 25, ECF No. 75-11 at PageID # 481. In his request, Plaintiff explained that "I am a Muslim, Islam is my Religion" and that his faith forbids him from eating "the flesh of swine." *Id.* He explained further that he would ideally follow a Halaal diet but, understanding that this might be difficult for the prison to accommodate, "a non-pork diet [would] suffice." *Id.* On January 5, 2016, Plaintiff's request was approved and he was placed on the "Alternative Meal List," which provides "alternative [v]egetarian or [n]on-pork meal[s] for all [r]eligious meal requests." *Id.*; *see also* ECF No. 75-12 at PageID # 482. As such, Plaintiff was to be "provided a vegetarian meal when pork is on the menu. Most other meals with protein [are] prepared according to the Mitzvah for Kosher." ECF No. 75-11 at PageID # 481.

On February 4, 2016, Plaintiff, who is allergic to pork, was sent to the HCF medical unit suffering from acute nausea after consuming a vegetarian meal cross-contaminated by utensils used to serve pork. ECF No. 75-14 at PageID # 484; ECF No. 75-26 at PageID # 496. Plaintiff alleges that Sgt. Sugai directed inmates working in the kitchen to use contaminated utensils to prepare Plaintiff's meal in order to harass him. ECF No. 1 at PageID # 8.

4

During the month of February 2016, both Plaintiff and the HCF Chaplain resubmitted requests for Plaintiff to be provided religious meals. *See* ECF No. 75-13 at PageID # 483; ECF No. 75-14 at PageID # 484. On February 25, 2016, Food Services responded to the Chaplain's request, once again approving Plaintiff's religious meal request and stating that the kitchen will "ensure proper kosher protocol (separate pots, utensils, etc.) are followed." ECF No. 75-14 at PageID # 484.

Despite these assurances, from February 2016 until Plaintiff was transferred to the SNF in May 2017, Sgt. Sugai withheld Plaintiff's religious meals by claiming Plaintiff was not on the religious meals list, directed inmate kitchen workers to prepare Plaintiff's meals with contaminated utensils and to serve Plaintiff smaller portions than other inmates, and sent Plaintiff away from the dining hall without any meal at all. ECF No. 1 at PageID # 8; *see also* ECF No. 75-1 at PageID ## 452-53; ECF No. 75-15 at PageID # 485; Dec. of Akoni K. Perry, ECF No. 75-34 at PageID # 504 ("I would prepare De Witt Long's meals under the [discretion] of Sgt. Sugai [who] would have me or tell me to make Mr. Long's trays smaller than other trays.").

On July 23, 2016, Plaintiff submitted a Step 1 grievance reporting this conduct, as well as Sgt. Sugai's use of "intimidating tactics and abusive language." ECF No. 75-15 at PageID # 485. Chief Antonio responded to this grievance two

months later, on September 23, 2016, simply stating "[a] preliminary investigation was done and your complaint was found to be invalid."  *Id.*

On July 24, 2016—the day after Plaintiff filed his grievance—Sgt. Sugai retaliated by implementing "his own version" of Meals to Modules ("MTM") with Plaintiff.  ECF No. 75-1 at PageID # 454; ECF No. 75-20 at PageID # 490.  HCF's official MTM program allows inmates who are in wheelchairs, use crutches or a walker, or are otherwise non-ambulatory to receive meals in their cells.  ECF No. 75-27 at PageID # 497.  Under Sgt. Sugai's version of the program, Plaintiff was to come to the kitchen to pick up his meals (still often undersized and inappropriate for his religious needs) and take them back to his cell to eat alone.  ECF No. 75-29 at PageID # 499; ECF No. 75-1 at PageID ## 454-55.  In a grievance, Plaintiff stated that Sgt. Sugai implemented this protocol in order to "have daily access and contact with [Plaintiff], so as to harass . . . , taunt, [and] antagoni[z]e [him] with verbal as well as psychological abuse."  ECF No. 75-29 at PageID # 499.

Plaintiff filed a Step 2 grievance on October 14, 2016, appealing Antonio's response to his last grievance and seeking an explanation as to why his complaint had been found invalid.  ECF No. 75-20 at PageID # 490.  HCF's Warden denied the grievance on October 27, stating—inaccurately—that "[t]he investigation into [the] complaint revealed that at the time of the alleged incident

[July 23, 2016,] [Plaintiff] was not on a non-pork or other special diet." *Id.* The Warden also explained that "[Sgt. Sugai] acted within the scope of [his] duties and conducted [himself] professionally." *Id.* On November 10, 2016, Plaintiff filed a Step 3 grievance appealing the Warden's response and reiterating his complaints about Sgt. Sugai. ECF No. 75-21 at PageID # 491. The Department of Public Safety's ("DPS") Acting Institutions Division Administrator denied Plaintiff's grievance on January 4, 2017. *Id.*

Meanwhile, on December 17, 2016, Plaintiff filed another Step 1 grievance against Sgt. Sugai. ECF No. 75-24 at PageID # 494. Chief Antonio again denied the grievance on January 27, 2017, stating only that "[y]our complaint of harassment was handled by Captain Mao." *Id.* On April 13, 2017, Plaintiff filed a Step 2 grievance appealing Chief Antonio's response. ECF No. 75-28 at PageID # 498. In the grievance, Plaintiff explained that despite Chief Antonio's statement that his "complaint of harassment [had been] handled by Captain Mao," Sgt. Sugai's "harassment and abuse of power" was continuing. *Id.* On May 2, 2017, the HCF Acting Warden replied to Plaintiff's grievance stating that "I will address professionalism standards with Sgt. Sugai." *Id.*

On May 5, 2017, Plaintiff filed a Step 3 grievance appealing the Warden's response. Plaintiff reiterated that for the last eight to nine months, Sgt. Sugai had been retaliating against him for past grievances in violation of the First

Amendment by verbally harassing him, tampering with and withholding meals, and refusing him entry into the dining hall.  ECF No. 75-29 at PageID # 499. Three days later, on May 8, 2017, Chief Antonio transferred Plaintiff to a general population unit in the SNF.  ECF No. 75-30 at PageID # 500; ECF No. 65-1 at PageID # 383.  Plaintiff was not informed of the reasons for the move.  ECF No. 75-30 at PageID # 500.

### 2. *Transfer to the SNF and to Arizona*

On May 18, 2017, Plaintiff filed a Step 1 grievance requesting an explanation for his transfer to the SNF and voicing his suspicions that he had been transferred in retaliation for submitting grievances against Sgt. Sugai.  *Id.*  On May 31, 2017, Chief Antonio and Warden Harrington responded to Plaintiff's grievance stating that "SNF is general population housing, your movement is not punitive. Administration does not have to provide a reason to assign housing."  *Id.*

Plaintiff's quality of life diminished at the SNF.  Plaintiff was unable to access the commissary or talk to his family on the phone as frequently as he had been able to prior to the move, was unable to access the law library, and, most significantly, was unable to participate in Islamic services that were available at the MF.  ECF 75-1 at PageID # 461.

On June 10, 2017, Plaintiff filed a Step 2 grievance appealing Chief Antonio's response and citing these depravations to argue that the move was

punitive and retaliatory.  ECF No. 75-32 at PageID # 502.  On June 22, 2017, the

HCF Warden responded to Plaintiff's grievance, stating that "the SNF is not

considered high security and your placement is not punitive."  ECF No. 75-32.  On

June 26, 2017, Plaintiff appealed that response in a Step 3 grievance, again

reiterating that the move to SNF had deprived him of opportunities he had at the

MF and pointing out that the only other inmates in his unit were those who had

been moved to the SNF for disciplinary reasons.  ECF No. 75-33 at PageID # 503.

On June 29, 2017, Plaintiff was transferred to Saguaro.  ECF No. 75-29 at PageID # 499; ECF No. 75-33 at PageID # 503.  On June 30, 2017, DPS's

Acting Institutions Division Administrator responded to Plaintiff's May 5 and June

26 grievances, stating simply "[i]nmate transferred to Saguaro Correctional Center

on 6/29/17.  Grievance closed."  ECF No. 75-29 at PageID # 499; ECF No. 75-33

at PageID # 503.

### 3.  *Cold Meals During Ramadan at the SNF*

Shortly after Plaintiff was transferred to the SNF, Ramadan began,

running from May 26 to June 27, 2017.  ECF No. 1 at PageID # 10.  In observance

of the holy month, Plaintiff was required to fast from sunrise to sunset, around 7:30

p.m.  *Id.*  Inmates at the SNF typically begin eating dinner in the dining hall at 3:30

p.m.  ECF No. 65-1 at PageID # 376.  Those who are unable to eat within the

ordinary meal structure for religious, medical, or administrative reasons may have meals delivered to their cells and eat them there. *Id.* at PageID ## 376-77.

During Ramadan, Plaintiff's dinner meals were delivered to his cell each day at 3:30 p.m., meaning that the meals sat for approximately four hours and were cold by the time Plaintiff could eat. ECF No. 1 at PageID # 10. Meat dishes were unappetizing to the point of being inedible, having congealed over the course of the four hours. ECF No. 1 at PageID # 11. Plaintiff repeatedly asked Sgt. Lee, who delivered meals to Plaintiff's unit, to either (1) call down to the kitchen to request a hot meal each evening; or (2) use the staff microwave to reheat the meals delivered each afternoon. ECF No. 75-1 at PageID # 449-50; ECF No. 82 at PageID # 533-34. Sgt. Lee informed Plaintiff that he could not call because the kitchen closes before 7:30 p.m. ECF No. 82 at PageID # 533. And staff are not allowed, per HCF policy, to use the staff microwave to heat food for inmates. ECF No. 65-1 at PageID # 386. By refusing his requests, Plaintiff argues that Sgt. Lee forced him to "choose between eating cold contaminated uneatable food or not [adhering] to [his] [r]eligious beliefs." ECF No. 82 at PageID # 534.

### 4.  *Lack of Religious Services at the SNF*

While Plaintiff was housed at the SNF he was "not provided the [opportunity], time, space . . . or area within the SNF facility to participate and practice [his] religious duties and obligations with [F]riday services," ECF No. 75-

1 at PageID # 462, and was "denied the access and [opportunity] to attend Islamic

services," ECF No. 82 at PageID # 534.  Plaintiff specifically states that he was

unable to attend Jumu'ah, an Islamic communal worship service held on Fridays,

which he had been able to attend at the MF prior to his transfer.  ECF No. 1 at

PageID # 9.  Plaintiff filed requests and grievances with Antonio seeking leave to

participate in Friday services, all of which Antonio denied.  *Id.*; ECF No. 75-1 at

PageID # 461-62.  Defendants explain that Plaintiff was not allowed to attend

services at the MF after his move because "HCF does not have the resources to

safely transfer inmates between the MF and the SNF in order to participate in

group activities" and that "[s]imilar opportunities to participate in religious

activities are available" at the SNF.  ECF No. 66-1 at PageID ## 399-400.

Defendants do not provide any information about what specific religious activities

are available to inmates at the SNF.

## B.    Procedural Background

On May 6, 2019, Plaintiff filed a pro se prisoner civil rights complaint

against Sgt. Sugai; Sgt. Lee; Chief Antonio; his case manager, Ms. Torres; and

fifty Doe Defendants.  ECF No. 1.  On May 23, 2019, the court screened Plaintiff's

Complaint, as required by 28 U.S.C. §§ 1915(e)(2) & 1915A(a).  ECF No. 6.  The

court dismissed all claims for damages against Defendants in their official capacity

as barred by the Eleventh Amendment.  *Id.* at PageID # 37.  The also court

dismissed all claims for injunctive relief against Defendants in both their official and personal capacities for lack of standing. *Id.* Finally, finding that Plaintiff had failed to state claims against Ms. Torres or the Doe Defendants, the court dismissed all counts against them, leaving only Plaintiff's claims for damages against Sgt. Sugai, Sgt. Lee, and Chief Antonio in their personal capacities. *Id.* at PageID # 41.

Defendants filed the instant Motion for Summary Judgment, ECF No. 65, on September 1, 2020. Plaintiff filed his Opposition, ECF No. 75, on September 25, 2020, and Defendants filed their Reply, ECF No. 79, on October 19, 2020. Plaintiff then filed a Sur-reply, ECF No. 82, on November 6, 2020. This Motion is decided without a hearing pursuant to Local Rule 7.1(c). ECF No. 81.

## III.  <u>STANDARDS OF REVIEW</u>

### A.    **Summary Judgment**

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Rule 56(a) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323).  "When the moving party has carried its burden under Rule 56[(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248).  When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence

13

of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor.") (citations omitted).

## B.    Pro Se Prisoner

Plaintiff is proceeding as a pro se prisoner.  His filings and motions must, therefore, be "construe[d] liberally."  *Ponder*, 611 F.3d at 1150; *see also Blaisdell v. Frappiea*, 729 F.3d 1237, 1241 (9th Cir. 2013); *Hamilton v. Brown*, 630 F.3d 889, 893 (9th Cir. 2011).  While ordinary pro se litigants must comply strictly with summary judgment requirements, pro se inmates are "expressly exempted from this rule."  *Ponder*, 611 F.3d at 1150 (explaining that "[i]t is the element of 'choice' which most clearly distinguishes *pro se* prisoner cases from ordinary *pro se* cases . . . an inmate's choice of self-representation is less than voluntary; and, when that unwilling self-representation is coupled with the further obstacles placed in a prisoner's path by his incarceration . . . it seems appropriate to apply the requirements of the summary judgment rule with less than strict literalness") (quoting *Jacobsen v. Filler*, 790 F.2d 1362, 1365 n.4 (9th Cir. 1986)).

## IV. <u>DISCUSSION</u>

Plaintiff alleges under 42 U.S.C. § 1983, that Sgt. Sugai, Sgt. Lee, and Chief Antonio each personally violated his First Amendment right to freely exercise his Islamic faith.  ECF No. 1 at PageID # 1.  He further claims that Sgt. Sugai and Chief Antonio violated the First Amendment by retaliating against him

14

for engaging in protected speech through use of the prison grievance system.  *Id.* at

PageID ## 8-9.

To state a claim under 42 U.S.C. § 1983, Plaintiff "must allege the

violation of a right secured by the Constitution and laws of the United States, and

must show that the alleged deprivation was committed by a person acting under

color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  State officials sued in

their individual capacities, like the Defendants here, are persons for the purposes of

§ 1983 and may be held personally liable for damages based upon actions taken in

their official capacities.  *Hafer v. Melo*, 502 U.S. 21, 27-28 (1991).[2]

To be held liable, each Defendant's personal conduct must have either

(1) directly subjected Plaintiff to a deprivation of federal rights; or (2) indirectly

caused Plaintiff to be subjected to the same.  *Lacey v. Maricopa Cnty.*, 693 F.3d

896, 915 (9th Cir. 2012).  A person "subjects" another to a rights violation if he

"does an affirmative act, participates in another's affirmative acts, or omits to

perform an act which he is legally required to do that causes the deprivation of

which complaint is made."  *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th

Cir. 1978)).  A person can "cause" another to be subjected to a rights violation "by

setting in motion a series of acts . . . which the actor knows or reasonably should

---

[2] And, because they are treated as private individuals, the Eleventh Amendment "does not erect a barrier against suits to impose individual and personal liability on state officials under § 1983."  *Hafer*, 502 U.S. at 30-31 (quotation and citation omitted).

know would cause . . . the constitutional injury." *Id.* (quoting *Duffy*, 588 F.2d at 743).  In the latter scenario, the defendant "must have at least the same level of intent as would be required if the [defendant] were directly to deprive the [plaintiff] of his constitutional rights." *Id.* at 916.

## A.    First Amendment Free-Exercise Claims

Plaintiff first argues that each of the Defendants deprived him of his First Amendment right to practice his religion while he was incarcerated at HCF. ECF No. 75-4 at PageID # 472.

Inmates "do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). And they "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted).  That said, the realities of incarceration limit the extent of these protections.  *Id.* ("'[L]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'") (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).

Against this backdrop, an inmate's right to religious freedom is violated if: (1) the defendant took an adverse action that substantially burdened the practice of the prisoner's religion; and (2) the defendant did so without any

16

justification reasonably related to legitimate penological interests. *Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987) ("[W]hen a [a prison official's conduct] impinges on inmates' constitutional rights, the [conduct] is valid if it is reasonably related to legitimate penological interests."). As to the first prong, the burdened religious belief need not be a mandatory or even central tenant of the inmate's religion. *Shakur*, 514 F.3d at 885. Rather, the inmate need only sincerely believe that the practice is consistent with his faith. *Id.* (citing *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) and *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)).

As to the second prong, under *Turner*, 482 U.S. 78, courts consider four factors (the "*Turner* factors") to determine whether the burden imposed on a plaintiff's religious beliefs is reasonably related to a legitimate penological interest: (1) whether there is a "valid, rational connection" between the defendant's conduct and the legitimate penological interest offered to justify it; (2) whether the plaintiff has alternative means by which they can practice their religion or is denied all means of religious expression; (3) what impact accommodating the asserted constitutional right would have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether ready alternatives to the conduct burdening plaintiff's rights are available, with the existence of obvious, easy alternatives suggesting that the defendant's conduct is unreasonable. *Id.* at 89-90;

*see also Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993).  In applying the *Turner* factors, although inferences about disputed facts must be drawn in the prisoner's favor, courts must also accord deference to the views of prison authorities as to "matters of professional judgment."  *Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

### 1.   *Sgt. Sugai*

Plaintiff alleges that Sgt. Sugai violated his First Amendment rights from February 4, 2016 until his transfer to the SNF on May 8, 2017, by refusing to provide him with meals that complied with his religious needs.  Plaintiff submitted evidence that, although he was on the HCF alternative meals list, Sgt. Sugai consistently withheld his religious meals by denying that Plaintiff was on the religious diet list, directing inmates working in the kitchen to contaminate Plaintiff's meals by preparing them with utensils that had been used to prepare pork, and sending Plaintiff away from the dining hall without providing him any meal at all.  ECF No. 75-1 at PageID ## 452-53; ECF No. 75-15 at PageID # 485; *see also* ECF No. 1 at PageID # 8.  As a result, Plaintiff went without meals on numerous occasions, ECF No. 75-15 at PageID # 485; ECF No. 75-16 at PageID # 486, and at least once fell seriously ill, ECF No. 75-1 at PageID # 452.

Plaintiff has clearly established the first prong of a free-exercise claim.  Under the Free Exercise Clause "[i]nmates . . . have the right to be provided with food sufficient to sustain them in good health that satisfies the dietary laws of

their religion." *McElyea v. Babbitt*, 833 F.2d 196, 198 (9th Cir. 1987).  Denial of

such food, therefore, plainly places a substantial burden on a prisoner's ability to

practice their religion.  *Id.*; *cf. Shakur*, 514 F.3d at 885.  Sgt. Sugai does not dispute

this point, but instead attempts to argue—unconvincingly—that he could not have

withheld or tampered with Plaintiff's meals because he lacked the authority to do

so.  ECF No. 66-2 at PageID ## 403-04.  Similarly, Sgt. Sugai's supervisor

declares that he "would not permit" an ACO to engage in such conduct.  ECF No.

66-3 at PageID # 407.  But that Sgt. Sugai was not authorized to harass Plaintiff

provides absolutely no evidence that he did not do so.  This circular argument is, in

fact, absurd—it suggests that no prison employee could commit a constitutional

violation because (presumably) no such employee is allowed to engage in such

conduct.

   In similarly unavailing fashion, Sgt. Sugai argues that he "never

instructed an HCF kitchen *staff worker*" to withhold or tamper with Plaintiff's

meals.  ECF No. 66-2 at PageID # 404 (emphasis added).  But as Plaintiff points

out, Defendant is "playing on semantics."  ECF No. 75-1 at PageID # 465.

Plaintiff does not allege that Sgt. Sugai instructed *staff* to tamper with his meals.

He alleges that Sgt. Sugai directed *inmates* working in the kitchen to do so.  *Id.*  In

addition to his own declaration to this effect, Plaintiff offers the declaration of one

such inmate worker who states that Sgt. Sugai directed him to tamper with

Plaintiff's meals by making them substantially smaller than the meals of other inmates.  ECF No. 75-34 at PageID # 504.

Sugai has failed to present any evidence that his conduct was rationally related to a legitimate penological purpose.  By contrast, Plaintiff has submitted evidence showing that Sugai engaged in pure harassment.  The Motion for Summary Judgment with respect to the free-exercise claim against Sgt. Sugai is DENIED.

### 2.    *Sgt. Lee*

Plaintiff next alleges that Sgt. Lee violated his right to freely exercise his religion by depriving him of hot dinner meals during the thirty days of Ramadan, from May 26 to June 24, 2017.  Because Plaintiff's meals were delivered to his cell at 3:30 p.m. but he was unable to eat until after sunset, around 7:30 p.m., his meals during Ramadan were cold.  ECF No. 82 at PageID # 533-34.  Plaintiff argues that by refusing to call down to the kitchen to request hot meals or to use the staff microwave to reheat Plaintiff's food, Sgt. Lee forced Plaintiff to "choose between eating cold contaminated uneatable food or not [adhering] to [his] religious beliefs."  *Id.*  PageID # 534.  Plaintiff declares that the cold food violated the prison's own health and safety standards and that meat dishes were often congealed and inedible by the time he was able to eat them.  ECF No. 75-1 at PageID ## 448-49; ECF No. 1 at PageID # 11.  Beyond the unappetizing texture of

20

the cold meat, Plaintiff has not pointed to any adverse consequences, to his health or otherwise, stemming from being served cold food.

These facts do not give rise to an actionable claim.  Indeed, the fact that "food . . . sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation."  *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir. 1993) (quotations and citations omitted).  Thus, there are no genuine issues of material fact suggesting that Sgt. Lee's refusal to warm Plaintiff's meals during Ramadan substantially burdened his right to practice his religion.  Defendants' Motion for Summary Judgment with respect to the Free-Exercise claim against Sgt. Lee is GRANTED.[3]

### 3.   *Chief Antonio*

Finally, Plaintiff alleges that Chief Antonio violated his First Amendment rights by transferring him to the SNF, where Plaintiff was "not provided the [opportunity], time, space . . . or area . . . to participate and practice [his] religious duties and obligations with [F]riday [Jumu'ah] services."  ECF No. 75-1 at PageID # 462.  While at the SNF, Plaintiff filed multiple requests with Chief Antonio to participate in Friday services, all of which Chief Antonio denied.

---

[3] Moreover, because the constitutional right to a hot meal is not clearly established, *see LeMaire*, 12 F.3d at 1456, even if a violation was found to have occurred, Sgt. Lee would be entitled to qualified immunity.  *See Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

*Id.* at PageID ## 461-62.[4]  Chief Antonio does not dispute that Plaintiff could no longer attend Friday Jumu'ah after moving to the SNF.  Instead, he argues that Plaintiff's rights were not violated because "similar opportunities to participate in religious activities are available" at the SNF.  ECF No. 66-1 at PageID # 400.  In the alternative, Chief Antonio argues that even if a constitutional violation did occur, he is entitled to qualified immunity.

       a.     *Merits*

Conduct that prevents an inmate from participating in religious services imposes a substantial burden on their sincerely held religious beliefs. *O'Lone*, 482 U.S. at 351; *Henderson v. Muniz*, 2017 WL 6885394, at *9 (N.D. Cal. 2017) (holding that restrictions on Jumu'ah prayers substantially burden a sincerely held religious belief).  Such a burden rises to the level of a constitutional violation if, applying the *Turner* factors, it is not justified by a legitimate penological objective.  *O'Lone*, 482 U.S. at 351-52 ("While we in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to

---

[4] Chief Antonio did not directly subject Plaintiff to an alleged constitutional violation. But by transferring Plaintiff to the SNF, he "set in motion a series of acts" that caused the violation. *See Lacey*, 693 F.3d at 915.  And, because Plaintiff repeatedly appealed to Chief Antonio regarding his lack of access to religious services at the SNF, he knew or should have known that the constitutional violation was occurring.  Thus, assuming a constitutional violation did occur, Chief Antonio's conduct was sufficient to create personal liability.  *See id.*

hold that prison officials are required by the Constitution to sacrifice legitimate

penological objectives to that end.").

The first *Turner* factor requires that the burden on Plaintiff's religious

belief be rationally related to a legitimate penological interest. *Shakur*, 514 F.3d at

885.  Here, Chief Antonio explains that Plaintiff was not able to go to the MF to

participate in Jumu'ah services because "HCF does not have the resources to safely

transfer inmates between the MF and SNF in order to participate in group

activities."  ECF No. 66-1 at PageID ## 399-400.  Prison resources and security

considerations are legitimate penological interests.  *Shakur*, 514 F.3d at 886; *see*

*also Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) ("[I]nternal [prison] security

. . . [is] perhaps the most legitimate of penological goals[.]").  Thus, this *Turner*

factor tilts in favor of Chief Antonio.

The next *Turner* factor considers whether Plaintiff had "'alternative

means by which he [could] practice his religion' or [was] 'denied all means of

religious expression.'"  *Shakur*, 514 F.3d at 886 (quoting *Ward*, 1 F.3d at 877).

Evidence of "numerous other means" through which an inmate may participate in

"other significant rituals and ceremonies of [his] faith" suggest that a constitutional

violation has not occurred.  *Id.*  Thus, in *O'Lone*, 482 U.S. at 352, restrictions that

prevented an inmate from engaging in Jumu'ah worship did not violate his free-

exercise rights where he was able to freely participate in a variety of other

"Muslim religious ceremonies." *Id.* (explaining that restrictions that prevented inmates from attending Jumu'ah were reasonable where "[t]he record establishes that respondents are not deprived of all forms of religious exercise, but instead freely observe a number of their religious obligations," including "unlimited" opportunities to congregate for prayer and discussion, free access to a state-provided imam, provision of religious meals, and special arrangements during Ramadan); *see also Williams v. Morton*, 343 F.3d 212, 219 (3d Cir. 2003) (holding that an inmate's free-exercise rights were not violated through provision of vegetarian meals rather than Halaal meat where the prison also allowed daily prayer, attendance of special weekly services, and observance of religious holidays).

By contrast, in *Ward*, 1 F.3d at 878, the second *Turner* factor weighed in favor of the plaintiff where he was able to engage in private prayer but was not able to attend religious services, congregate with other practitioners of his faith for prayer and discussion, or access a Rabbi. *Id.* ("[W]e cannot conclude that the opportunity to engage in private prayer is enough to satisfy the second *Turner* factor . . . .  If it were, the factor would have no meaning at all because an inmate would always be able to pray privately.").

Here, Chief Antonio argues that because Plaintiff was "still a 'general population' inmate" he "would not have been prevented from participating in any

24

religious activities" at the SNF.  ECF No. 66-4 at PageID # 410.  But Chief

Antonio has utterly failed to present evidence regarding what—if any—religious

activities are actually available at the SNF.  The dispute over Plaintiff's cold meals

during Ramadan suggests that at least some accommodations were made to allow

Plaintiff to fast in keeping with his faith.  But based on Defendant's evidence, it is

impossible to know whether any religious services were offered at SNF, or if, as in

*Ward*, Plaintiff's only realistic option was to engage in private prayer.  Thus, the

second *Turner* factor favors Plaintiff.  *See Haynes v. Hedgpeth*, 2015 WL

1138411, at *6 (N.D. Cal. Mar. 12, 2015) (reviewing a motion for summary

judgment on a pro se prisoner's free-exercise claims and explaining that "[t]he

Court assumes that [religious] services were not available to . . . inmates [in a

particular facility] if Defendants are unable to provide evidence to the contrary").

   Next, under the third *Turner* factor, the court considers the impact that

accommodating Plaintiff's religious needs would have on guards and other

inmates, and on allocation of prison resources generally.  *Shakur*, 514 F.3d at 886.

Under this factor, the court gives "deference to the prison official's own

assessment of the burden on prison operations," but cannot "accept the [official's]

assertion . . . that the disruption would be significant absent specific findings."  *Id.*

at 887 (quotation and citation omitted).  Thus, where there is "no evidence in the

record suggesting that [the defendant] . . . in any way studied the effect that

accommodation would have," this factor weighs in favor of the plaintiff. *Id.*

Plaintiff's requested accommodation was to attend Jumu'ah services. Defendants argue that "forcing HCF to have activities would have a substantial effect on prison operations because it would require a significant increase in resources (facilities, staffing, etc[.]) in order to safely and repeatedly transfer inmates between the different facilities." ECF No. 65-1 at PageID # 385. While this reasoning appears logical, there is no indication in the record that Chief Antonio made specific findings about the burdens the accommodation would impose on the prison as required under the third *Turner* factor. Further, as discussed above, it is unclear from the record whether Jumu'ah was offered at the SNF at all. Thus, another accommodation may have been to hold Jumu'ah services (or other religious service options, if not already offered) at the SNF, and there is no evidence before the court as to the burden such alternative offerings would place on the prison. Without more facts, this factor is neutral. *Shakur*, 514 F.3d at 887 ("On this record, which consists essentially of a brief affidavit . . . that summarizes the prison's concerns but makes no attempt to estimate their magnitude in relation to the plaintiff's religious claims, the balance is too close for summary judgment to be proper.") (quoting *Hunafa v. Murphy*, 907 F.2d 46, 48 (7th Cir. 2009)).

26

The final *Turner* factor considers whether there are "ready alternatives" that would accommodate Plaintiff's religious needs. *Turner*, 482 U.S. at 90. The "existence of obvious, easy alternatives" may be evidence that the burden imposed on the plaintiff is not reasonable. *Id.* Here again, the record is not sufficiently developed to allow the court to analyze this factor, which effectively turns on the specifics of the "similar opportunities to participate in religious activities" that are available at the SNF. Because there is no information in the record about the religious activities offered at the SNF, this factor is also neutral. *Cf. Shakur*, 514 F.3d at 887.

In short, because Chief Antonio has only demonstrated that one of the *Turner* factors supports his position, he has failed to meet his burden of showing the absence of genuine issues of material fact as to the free-exercise claim.

   b. *Qualified Immunity*

Alternatively, Chief Antonio argues that he should escape liability at summary judgment because he is entitled to qualified immunity. The doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Burns v. Reed*, 500 U.S. 478, 495 (1991); *see also Jones v. Williams*, 791 F.3d 1023, 1033 (9th Cir. 2015). Government officials are entitled to qualified immunity unless "(1) the facts taken in the light most favorable to the party asserting the injury show that the defendants' conduct

violated a constitutional right and (2) the right was clearly established at the time of the alleged violation." *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1160 (9th Cir. 2014) (internal alterations, quotations, and citations omitted). A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lacey*, 693 F.3d at 915 (9th Cir. 2012) (quotation omitted); *see also Jones*, 791 F.3d at 1033. Here, the court has already determined that, for the purposes of summary judgment, a constitutional rights violation may have occurred. The court now considers whether the violated right was clearly established.[5]

A constitutional right can be clearly established by relevant Supreme Court and appellate case law. *See Jones*, 791 F.3d at 1033-34. But as the Supreme Court has repeatedly admonished, *see Sampson v. Cnty. of L.A.*, 974 F.3d 1012, 1024 (9th Cir. 2020), a "clearly established" rights violation cannot be defined at a "high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). This is because generalizing "avoids the crucial question [of] whether the official acted reasonably in the particular circumstances that [they] faced." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Put another way, to clearly

---

[5] Courts have discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

establish a constitutional violation, prior case law must concern "sufficiently similar facts" to the case at hand.  *Sampson*, 974 F.3d at 1024.

Here, case law has clearly established that the particular act of denying an inmate the opportunity to attend *any* religious services is a First Amendment violation.  *See, e.g.*, *O'Lone*, 482 U.S. at 348; *Ward*, 1 F.3d at 878; *Williams*, 343 F.3d at 219.  But denying an inmate the opportunity to engage in a *particular* religious service—where that denial advances a legitimate penological interest and where alternatives are available—does not rise to the level of a constitutional violation.  *See, e.g.*, *O'Lone*, 482 U.S. at 348; *Ward*, 1 F.3d at 878; *Williams*, 343 F.3d at 219.

Thus, the qualified immunity inquiry turns upon the same unresolved factual questions as the merits of the underlying claim.  That is, Chief Antonio is not entitled to qualified immunity if suitable alternatives were unavailable at the SNF because it would have been clear to a reasonable officer that by transferring Plaintiff to the SNF and repeatedly denying his requests to attend Jumu'ah he was violating Plaintiff's right to freely practice his religion.  But if the transfer did not, in fact, have the effect of depriving Plaintiff of access to any religious services, then Chief Antonio could have reasonably believed he was not violating Plaintiff's rights.  On the disputed record before the court, however, it is impossible to decide this question.

Defendants have failed to meet their burden to establish an absence of genuine issues of material facts as to Chief Antonio's alleged violation of Plaintiff's free exercise rights, and as to his claim for qualified immunity. The Motion for Summary Judgment with respect to the free exercise claim against Chief Antonio is DENIED.

## B.     First Amendment Retaliation

Plaintiff also brings First Amendment retaliation claims against Sgt. Sugai and Chief Antonio. "Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)). "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote and citations omitted).

///

///

///

30

### 1.     Sgt. Sugai

Plaintiff alleges that Sgt. Sugai retaliated against him for using the prison grievance system to report Sgt. Sugai's harassment.  The court considers each of the five elements of a retaliation claim in turn.

First, Plaintiff plainly engaged in protected activity by filing grievances.  *See, e.g.*, *Jones*, 791 F.3d at 1035 (citing *Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1005 (7th Cir. 2005) ("Prisoners' grievances, unless frivolous . . . are protected by the First Amendment.") (other citations omitted)); *see also Watison*, 668 F.3d at 1114.

Next, Plaintiff has demonstrated that Sgt. Sugai engaged in adverse actions after Plaintiff submitted grievances against him.  For the purpose of a retaliation claim, an adverse action need not rise to the level of an "independent constitutional violation."  *Watison*, 668 F.3d at 1114.  Rather, the "mere threat of harm can be an adverse action."  *Id.* (quotation and emphasis omitted).  Here, Plaintiff provides evidence that Sgt. Sugai (1) directed inmate kitchen workers to make Plaintiff's meals smaller than those given to other inmates; (2) directed inmate kitchen workers to use pork-contaminated utensils to prepare Plaintiff's meals; (3) forced Plaintiff to go back to his module to eat alone; and (4) harassed and insulted Plaintiff in an attempt to goad him into an altercation.  ECF No. 75-1 at PageID ## 452-55; ECF No. 75-20 at PageID # 490; ECF No. 75-29 at PageID

# 499.  These actions tangibly harmed Plaintiff—depriving him of food and socially isolating him, among other things—and thus qualify as adverse actions.

Third, Plaintiff must establish that the adverse actions were causally connected to his protected speech.  To do so, Plaintiff must "put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [Sgt. Sugai's] intent."  *Shepard v. Quillen*, 840 F.3d 686, 689 (9th Cir. 2016) (quotation and citation omitted).  Plaintiff may provide either direct or circumstantial evidence of motive, including "proximity in time between protected speech and alleged retaliation."  *McCollum v. Cal. Dep't of Corr.& Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011).  Sugai's harassment pre-dated and, indeed, was the impetus for Plaintiff's use of the grievance system.  But there is also evidence that Sgt. Sugai's conduct escalated after Plaintiff began filing grievances.  For example, Plaintiff submitted a grievance against Sgt. Sugai on July 23, 2016, ECF No. 75-15 at PageID # 485, and the next day, Sgt. Sugai implemented his "own version" of the MTM program—requiring Plaintiff to pick up his tray from the kitchen and return to his cell to eat alone.  ECF No. 75-1 at PageID # 454; ECF No. 75-20 at PageID # 490.[6]  This evidence is sufficient to infer that Sgt. Sugai acted with a retaliatory motive.

---

[6] Defendants appear to admit that Sugai was retaliating against Plaintiff: one of the justifications given for Antonio's decision to transfer Plaintiff to the SNF was to shield him from "exposure to any additional retaliation" at the hands of Sugai.  ECF No. 79 at PageID # 523.

Fourth, Plaintiff must allege that the "official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Watison*, 668 F.3d at 1114 (quoting *Rhodes*, 408 F.3d at 568).  Any harm that is "more than minimal will almost always have a chilling effect."  *Rhodes*, 408 F.3d at 567 n.11; *see also Brodheim*, 584 F.3d at 1271.  Here, the court can reasonably infer a chilling effect from Sgt. Sugai's conduct, which unquestionably caused more than minimal harm to Plaintiff by depriving him of suitable food, isolating him, and subjecting him to verbal and psychological abuse.  *See Watison*, 668 F.3d at 1116 (finding both threats and intimidation and "deprival of food" to constitute more than minimal harm sufficient to give rise to a chilling effect).

Finally, Plaintiff must establish that, in addition to a retaliatory motive, defendant's actions were not related to a legitimate penological goal. Plaintiff can meet this element by showing that Sgt. Sugai's conduct was "arbitrary and capricious" or "unnecessary to the maintenance of order in the institution." *Watison*, 668 F.3d at 1114-15.  Plaintiff provides evidence that Sgt. Sugai was singling him out and harassing him.  Harassment plainly is not necessary to maintain order or to any other legitimate penological goal.

Sgt. Sugai has not advanced any arguments or put forth any evidence to contest Plaintiffs' allegations as to any of the elements of a retaliation claim, or to otherwise explain why his conduct was not retaliatory.  Once again, Sgt. Sugai's

single—and wholly unavailing—argument is that he could not have engaged in retaliatory conduct because he lacked the authority to do so.  ECF No. 66-2 at PageID ## 403-04; ECF No. 66-3 at PageID # 407.  Sgt. Sugai has failed to demonstrate the absence of any genuine issues of material fact as to Plaintiff's retaliation claim against him.  Defendants' Motion for Summary Judgment as to the retaliation claim against Sgt. Sugai is DENIED.

   2.   *Chief Antonio*

        Finally, Plaintiff argues that Chief Antonio retaliated against him for filing grievances by transferring Plaintiff to the SNF.  Chief Antonio responds that the move was motivated by a legitimate penological interest.

        As above, the court considers each of the five elements of a retaliation claim in turn.  Again, the first element is easily satisfied because filing prison grievances is protected conduct under the First Amendment.  *See, e.g.*, *Jones*, 791 F.3d at 1035; *Watison*, 668 F.3d at 1114.

        Next, Plaintiff has demonstrated that Chief Antonio's decision to transfer him to the SNF was adverse.  Defendant argues that the transfer was not adverse because Plaintiff was still in a general population unit and because "Plaintiff has no constitutional right to be housed in a particular prison facility." ECF No. 65-1 at PageID # 383.  But transfer alone can be considered an adverse action so long as it was initiated in response to an inmate's exercise of his First

Amendment rights.  *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) ("to succeed on his retaliation claim, [a plaintiff] *need not establish an independent constitutional interest in . . . assignment to a given prison . . .* because the crux of his claim is that state officials violated his *First Amendment* rights by retaliating against him for his protected speech activities.") (some emphasis added, some emphasis in original); *Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995) ("[T]he law clearly establishe[s] that defendants cannot transfer a prisoner from one correctional institution to another in order to punish the prisoner for exercising his First Amendment right[s.]"); *Brodheim*, 584 F.3d at 1270 (explaining that the mere implied threat of transfer is an adverse action for the purpose of a retaliation claim).

The transfer also clearly resulted in harm sufficient to "chill or silence a person of ordinary firmness from future First Amendment activities," *Watison*, 668 F.3d at 1114, because it deprived Plaintiff of privileges he enjoyed in the MF, including access to the law library, frequent phone and commissary access, and the opportunity to attend religious services.  ECF No. 75-1 at PageID # 461.

Plaintiff must next show that Chief Antonio acted with a retaliatory motive.  Suspect timing provides some evidence of retaliatory intent here: on May 5, 2017, Plaintiff submitted a grievance appealing the inadequate responses of Chief Antonio and the HCF Warden to his past grievances and he was transferred

to the SNF just three days later, on May 8.  ECF No. 75-29 at PageID # 499; ECF

No. 75-30 at PageID # 500.  Chief Antonio does not dispute that he transferred

Plaintiff because of his grievances.  He argues, however, that the motive was non-

retaliatory.  ECF No. 65-1 at PageID # 383-84 ("Plaintiff's transfer was not in

retaliation for his grievances but in recognition of them.").  That is, Chief Antonio

argues that his decision to transfer Plaintiff was motivated purely by legitimate

reasons.  Thus, consideration of the retaliatory motive factor collapses into the

inquiry as to the fifth and final element of a retaliation claim: whether the

defendant's conduct advanced a legitimate correctional goal.

          Turning to that factor, Chief Antonio offers three reasons for his

decision to move Plaintiff to the SNF: to separate Plaintiff and Sgt. Sugai in order

to prevent future conflicts; to allow HCF time to investigate Plaintiff's complaints;

and, in the case that the investigation substantiated Plaintiff's complaints against

Sgt. Sugai, to shield him from additional retaliation.  *Id.* at PageID # 383.

          In considering the legitimate interest factor, the court must accord

substantial deference to Chief Antonio's judgment.  *See Pratt*, 65 F.3d at 807

(explaining that in considering the fifth factor in prisoner retaliation claims,

"federal courts ought to afford appropriate deference and flexibility to state

officials trying to manage a volatile environment" (quoting *Sandin v. Conner*, 515

U.S. 482 (1995))).  But if a legitimate rationale is advanced as a pretext to silence

or punish an inmate because he filed grievances, a prison official "cannot assert that [their conduct] served a valid penological purpose," even if their conduct actually had the effect of advancing such a purpose. *See Bruce v. Ylst*, 351 F.3d 1283, 1289 (9th Cir. 2003).

Maintaining order and safety within a prison facility, including by reducing conflicts between inmates and guards, is a legitimate penological interest. *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005); *Schroeder*, 55 F.3d at 461. And separating the conflicting parties, as Chief Antonio did here, is certainly an effective way to achieve this end. Thus, the justification Antonio offers related to reducing conflict between Plaintiff and Sgt. Sugai appears facially legitimate. There is also insufficient evidence in the record to suggest that this reasoning was pretextual. To the contrary, in his declaration, Chief Antonio elaborates on his reasoning for the transfer, explaining that he was aware of escalating tensions between Sgt. Sugai and Plaintiff, and that he felt it was in the best interest of both parties to separate them. ECF No. 66-4 at PageID # 410. He also explains that, in his professional view, "[b]ecause ACO Sugai was responsible for the kitchen area that the MF utilizes, it was necessary to move Plaintiff to the Special Needs Facility." *Id.*

Chief Antonio has demonstrated that his decision to transfer Plaintiff to the SNF was motivated by a legitimate penological interest, thereby foreclosing

the possibility that Plaintiff can prevail on his retaliation claim.  The Motion for Summary Judgment with respect to the retaliation claim against Chief Antonio is GRANTED.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion for Summary Judgment as to the free-exercise and retaliation claims against Sgt. Sugai, and the free-exercise claim against Chief Antonio is DENIED.  Defendant's Motion for Summary Judgment is, however, GRANTED as to the retaliation claim against Chief Antonio and the free-exercise claim against Sgt. Lee.  With no other claims remaining against him, Sgt. Lee is TERMINATED from this suit.  What remains are Plaintiff's First Amendment free-exercise and retaliation claims against Sgt. Sugai and his First Amendment free-exercise claim against Chief Antonio.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, December 18, 2020



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Long v. Sugai*, Civ. No. 19-00235 JMS-RT, Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment, ECF No. 65.