IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| DE WITT LAMAR LONG, | CIV. NO. 19-00235 JMS-RT |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| vs. | |
| SGT. SUGAI, et al., | |
| Defendants. | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**I.  INTRODUCTION**

The court conducted a non-jury trial in this case on May 17 and May 18, 2022.  Pursuant to Federal Rule of Civil Procedure 52(a), the following constitute the court's Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").  To the extent any Findings as stated may also be deemed to be Conclusions, they shall also be considered Conclusions.  *See In re Bubble Up Del., Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982).  Similarly, to the extent any Conclusions as stated may be deemed to be Findings, they shall also be considered Findings. *See id.*

## II. **OVERVIEW**

In this pro se prisoner civil rights action arising under 42 U.S.C. § 1983, Halawa Correctional Facility ("HCF") inmate De Witt Lamar Long ("Plaintiff") asserts Fourteenth Amendment claims against two HCF officials ("Defendants") for incidents that allegedly occurred between 2016 and 2017. Specifically, Plaintiff—a practicing Muslim—alleges that Adult Correctional Officer ("ACO") Sergeant Rodney Sugai violated Plaintiff's constitutional right to freely exercise religion by denying Plaintiff religious meals, and that Sgt. Sugai retaliated against Plaintiff for filing a confirmatory religious-diet request and for using the prison grievance system to report alleged harassment.  *See* ECF No. 1 at PageID ## 3, 8.  Plaintiff also alleges that then-Chief of Security Lyle Antonio violated Plaintiff's constitutional right to freely exercise religion by denying Plaintiff access to Islamic prayer services.  *See id.* at PageID ## 3, 9.

The evidence presented at trial included live testimony from six witnesses[1] and the admission of eighteen exhibits.  The court has heard and weighed all the evidence and testimony presented at trial, observed the demeanor of witnesses and evaluated their credibility and candor, and heard and considered Plaintiff's and Defendants' arguments.  The court does not detail all of the

---

[1] The six witnesses were Plaintiff; Chief Antonio; Sgt. Sugai; then-assistant chaplain and now head chaplain at HCF, Alan Leigh; then-supervisory cook and now food service manager at HCF, Lance Panui; and the program control administrator at HCF, Gary Kaplan.

evidence presented, as many of the details are cumulative, only marginally relevant, and/or unnecessary to understanding the court's ultimate analysis.[2] Rather, the court makes findings sufficient for the parties and the Ninth Circuit to understand the basis of the court's rulings on Plaintiff's claims. *Cf. Norris v. City & Cnty. of S.F.*, 900 F.2d 1326, 1329 (9th Cir. 1990).

The credible evidence establishes that Plaintiff failed to prove his free-exercise claims—Defendants either took no faulty action or, if they did, their actions were justified by legitimate penological interests. The credible evidence also establishes that Plaintiff failed to prove his retaliation claim—Sgt. Sugai either took no adverse action or, if he did, his action reasonably advanced legitimate correctional goals. As such, the court finds in favor of Defendants.

## III.  <u>PROCEDURAL HISTORY</u>

This case has narrowed significantly since Plaintiff filed his Complaint on May 6, 2019, ECF No. 1. Plaintiff originally asserted claims arising under 42 U.S.C. § 1983 against Sgt. Sugai, Chief Antonio, ACO Sergeant Wyatt Lee, a case manager named "Ms. Torres," and an unnamed "inmate grievance

---

[2] For example, there was extensive testimony concerning whether and how Plaintiff could have obtained a janamaz (an Islamic prayer mat), a kufi (an Islamic prayer hat), and a copy of the Quran (the central religious text of Islam) during the 2016–2017 period. However, Plaintiff does not assert that Sgt. Sugai or Chief Antonio were involved in any way in Plaintiff's unsuccessful attempts to obtain those religious items.

officer," all in their individual and official capacities as HCF employees.[3]  ECF

No. 1.  Plaintiff's § 1983 claims are based in part on the protections in the First

Amendment against governmental infringement of the free exercise of religion,

which are incorporated against the States under the Fourteenth Amendment, *see*

*School District of Abington Township, Pa. v. Schempp*, 374 U.S. 203, 215 (1963).

Otherwise, Plaintiff's § 1983 claims are based on the protections against

governmental retaliations—including by state actors—in the First Amendment and

under the unconstitutional-conditions doctrine.  *See Blaisdell v. Frappiea*, 729 F.3d

1237, 1242 (9th Cir. 2013).

Plaintiff had also asserted a § 1983 claim based on the Fourteenth

Amendment's due process clause; through that claim, Plaintiff alleged that the

unnamed "inmate grievance officer" violated his rights to due process by failing to

respond to and/or denying his prison grievances.  *See* ECF No. 1 at PageID # 14.

But the court dismissed that claim in a May 23, 2019 order.  ECF No. 6.  In that

same order, the court dismissed Plaintiff's § 1983 claim against Ms. Torres, as well

as all of the official-capacity components of the § 1983 claims against Sgt. Sugai,

---

[3] The State of Hawaii's Department of Public Safety operates the Halawa Correctional
Facility, where all of the named Defendants were employed during the 2016–2017 period.

Chief Antonio, and Sgt. Lee.  *Id.*  But the court allowed the individual-capacity

§ 1983 claims against Sgt. Sugai, Chief Antonio, and Sgt. Lee to proceed.  *Id.*[4]

On December 18, 2020, the court granted summary judgment against

Plaintiff's free-exercise claim against Sgt. Lee, dismissing Sgt. Lee from the case.

ECF No. 84.  And the court granted summary judgment against Plaintiff's

retaliation claim against Chief Antonio.  *Id.*  But the court denied summary

judgment as to Plaintiff's free-exercise claim against Chief Antonio and as to

Plaintiff's retaliation and free-exercise claims against Sgt. Sugai.  *Id.*

On May 17, 2022, a bench trial proceeded on those three remaining

claims and spanned two consecutive days.  *See* ECF Nos. 152, 153.  After trial,

Defendants submitted proposed Findings of Fact and Conclusions of Law, ECF

No. 155.

## IV.  **FINDINGS OF FACT**[5]

### A.    **Plaintiff's Religious Practices and Incarceration at HCF**

1.      Plaintiff is a practicing Muslim and was a practicing Muslim during

the relevant 2016–2017 time period.  Tr. Day 1 (Mr. De Witt Lamar Long).  He

---

[4] Further, in a June 18, 2020 order denying summary judgment, the court rejected the argument that Plaintiff had failed to exhaust the individual-capacity claims against Sgt. Sugai, Chief Antonio, and Sgt. Lee.  *See* ECF No. 52.

[5] The court provides citations to the exhibits admitted at trial.  The court also relies on trial testimony, but because the official transcript was not yet available, the court cites generally to "Tr. Day 1" or "Tr. Day 2" with a parenthetical indicating the testifying witness.

practices daily Islamic prayers, at times wears a kufi (an Islamic prayer hat), and attempts to abide by the Islamic halal diet,[6] which excludes pork.  *Id.*

2.    Although Plaintiff desires to abide by a proper halal diet, his experience at correctional institutions has led him to understand that not all institutions can accommodate the halal diet.  *Id.*  He is thus amenable to substituting his halal diet with some other non-pork diet, including vegetarian or kosher[7] diets.  *Id.*

3.    Plaintiff began his incarceration at HCF in December 2015.  *Id.*  He was housed in the medium-security facility from December 2015 until May 8, 2017, the day he was moved to the high-security facility.  *Id.*; Ex. J-25 (Plaintiff's prison grievance describing the events of May 8, 2017).  In June 2017, Plaintiff was transferred to a correctional facility outside of Hawaii.  Tr. Day 1 (Acting Warden Lyle Antonio).  Plaintiff was subsequently transferred back to HCF, but that second period at HCF is not pertinent to this case.  *See* Tr. Day 1 (Mr. De Witt Lamar Long).

---

[6] "Halal, or lawful, diet includes fruits, vegetables, seafood, and meat from herbivorous animals such as cows and chickens that are properly slaughtered."  *Williams v. Morton*, 343 F.3d 212, 215 (3d Cir. 2003).  The halal diet excludes pork.  Tr. Day 1 (Mr. De Witt Lamar Long); *Al-Alamin v. Gramley*, 926 F.2d 680, 682 (7th Cir. 1991).

[7] A kosher diet is a tenant of the Jewish faith and "forbids consumption of pork, shellfish, rabbit, and seafood without fins or scales."  *Smith v. Stewart*, 2020 WL 6162917, at *9 (W.D. Wash. July 29, 2020), *report and recommendation adopted*, 2020 WL 6161248 (W.D. Wash. Oct. 21, 2020).  "Permitted meats must be slaughtered in a specific way," and "kosher foods cannot come into contact with non-kosher foods."  *Id.*

4.      Soon after arriving at HCF in December 2015, Plaintiff filed an inmate request with HCF's chaplain asking that he be placed on a "non-pork diet" to accommodate his Islamic faith.  Ex. J-23; Tr. Day 1 (Mr. De Witt Lamar Long). That request was jointly approved by food service manager Brian Watanabe, program control administrator Gary Kaplan, and chaplain Charles Noland Jr. on January 6, 2016.  Ex. J-24.

5.      Plaintiff received accommodating meals without issue for two to three weeks following the January 6, 2016 approval.  Tr. Day 1 (Mr. De Witt Lamar Long).  Plaintiff would walk from his housing unit to the cafeteria, put his identification into the kitchen-window trap door, receive his accommodating meal, and eat his meal in the cafeteria.  *Id.*

6.      The official procedures for obtaining those accommodating meals were as follows:  Plaintiff would place his identification into a trap door on one side of the kitchen window; behind that window were a kitchen-work line of inmates, an ACO, a civilian[8] cook supervisor, and possibly a civilian food service manager; the ACO or the cook supervisor would check Plaintiff's identification against a meal-accommodations list posted on the other side of the kitchen

_____

[8] The court uses the term "civilian" to describe workers at HCF that are not security staff; for example, the food service manager and the chaplain are civilian staff.  *See* Tr. Day 2 (Mr. Lance Panui).  Those civilian employees are outside the security-staff chain of command (e.g., the Sergeant, Lieutenant, Captain, Chief of Security, Deputy Warden, and Warden).  *See id.*

7

window; if Plaintiff's name appeared on the list, an inmate worker would be
informed of what food should be placed on Plaintiff's meal tray, i.e., food
compliant with his non-pork diet.  *See* Tr. Day 2 (Mr. Lance Panui); Tr. Day 1
(Sgt. Rodney Sugai).

7.    Although there was conflicting testimony concerning who can verify
that an inmate is on the posted list, the court finds that either the ACO or the cook
supervisor can complete the verification.  *See* Tr. Day 1 (Sgt. Rodney Sugai
testifying that ACOs know who is on the meal-accommodations list because it is
posted on the kitchen wall); *see id.* (Sgt. Rodney Sugai taking question of whether
he would know who is on the list, and answering, "I would have to take [the
identification] and go look on that list to see" if the identification matched); *but see*
Tr. Day 2 (Mr. Lance Panui testifying that ACOs are not involved in verification).

**B.    Plaintiff's First Interaction with Sgt. Sugai—Denials of Non-Pork Meals**

8.    In late 2015 through early 2016, Plaintiff was denied non-pork meals
on at least one occasion.  *See* Tr. Day 1 (Mr. De Witt Lamar Long); Ex. J-4 (step 3
grievance filed by Plaintiff stating that he was denied non-pork meals multiple
times starting in December 2015); *see also* Ex. J-48 (step 2 grievance filed on Feb.
9, 2016 underlying the step 3 grievance filed on Oct. 10, 2018).  Sgt. Sugai was an
ACO behind the kitchen window for that period of time.  *See* Tr. Day 1 (Mr. De
Witt Lamar Long); Tr. Day 1 (Sgt. Rodney Sugai testifying that during the 2016–

8

2017 period, he served as the ACO behind the kitchen window during the 11 a.m. to 7 p.m. shift).

9.     The parties disagree as to the cause of those denials.  Plaintiff asserts that Sgt. Sugai was responsible for denying Plaintiff non-pork meals in disregard of the posted meal-accommodations list.  *See* ECF No. 1 at PageID # 8; Tr. Day 1 (Mr. De Witt Lamar Long testifying that his first altercation with Sgt. Sugai was putting his identification through the trap door and Sgt. Sugai depriving him of an accommodating meal).  Plaintiff, in fact, filed a grievance against Sgt. Sugai for the allegedly wrongful denials.  *See* Tr. Day 1 (Mr. De Witt Lamar Long).

10.     But there is credible evidence establishing that Sgt. Sugai was not responsible for those denials—at worst, he was merely relaying to Plaintiff that Plaintiff was rightly or wrongly not on the meal-accommodations list.  Sgt. Sugai may have correctly told Plaintiff he was not entitled to an accommodating meal given that some of the denials Plaintiff complains of occurred before his religious-diet request was approved on January 6, 2016.  *See* Ex. J-48 (step 2 grievance filed by Plaintiff on Feb. 9, 2016 in which he references denials occurring on Dec. 31, 2015 and Jan. 5, 2016); *see also* Tr. Day 1 (Mr. De Witt Lamar Long testifying that, initially, he mistakenly submitted a religious-diet request to the medical unit and subsequently submitted a proper request to the chaplain); Ex. J-22 (initial religious-diet request that Plaintiff submitted to the medical unit on Dec. 15, 2016).

11.     And assuming that Sgt. Sugai told Plaintiff he was not entitled to an accommodating meal after the January 6, 2016 approval, the court finds that Sgt. Sugai did *not* do so in disregard of the posted meal-accommodations list—multiple witnesses credibly testified that Sgt. Sugai did not at any time disregard the posted meal-accommodations list. *See, e.g.*, Tr. Day 1 (Sgt. Rodney Sugai credibly testifying that he has never denied an accommodating meal to an inmate who was on the posted list); Tr. Day 2 (Mr. Lance Panui testifying that he never observed an ACO refusing to provide an accommodating meal to an inmate). Given that overwhelming and credible testimony, the court finds that if Sgt. Sugai told Plaintiff he was not entitled to an accommodating meal subsequent to the January 6, 2016 approval, Sgt. Sugai was doing so based on Plaintiff's name being absent from an inaccurate meal-accommodations list. That finding is corroborated by Plaintiff's step 2 grievance that he filed on February 9, 2016, in which he blames denials on "the chaplain's failure to place [Plaintiff] on the non-pork list for religious reasons," Ex. J-48. *See also id.* (response to step 2 grievance stating that Plaintiff would be added to the meal-accommodations list immediately).

## C.     Pork Contamination Incident

12.     Sometime in early February 2016 after Plaintiff's first interaction with Sgt. Sugai and after Plaintiff's first grievance against Sgt. Sugai, Plaintiff visited the cafeteria and followed normal procedures for obtaining his non-pork meal, but

he instead received a meal containing pork remnants.  Tr. Day 1 (Mr. De Witt
Lamar Long).  He returned the meal to an ACO who verified that it contained pork.
*Id.*  Plaintiff was then directed to the sally-port corridor[9] to pick up a substitute,
vegetarian meal tray.  *Id.*  That tray was pre-wrapped and was provided to Plaintiff
by Sgt. Sugai.  *Id.*  Plaintiff began eating from the substitute meal tray without
realizing that it also contained pork strands.  *Id.*  Plaintiff became sick from eating
the pork strands and had to receive treatment from the medical unit for stomach
issues.  *Id.*

13.     Once again, the parties disagree as to Sgt. Sugai's responsibility.
Plaintiff asserts that Sgt. Sugai directed kitchen-inmate workers to lace Plaintiff's
meal tray with pork strands.  *See* ECF No. 1 at PageID # 8; Tr. Day 1 (Mr. De Witt
Lamar Long testifying that he filed a grievance against Sgt. Sugai for the pork-
contamination incident).  Sgt. Sugai, on the other hand, testified that as the kitchen
ACO he had no authority to direct inmate workers on how to prepare Plaintiff's
meals.  Tr. Day 1 (Sgt. Rodney Sugai).  Sgt. Sugai also testified that he never
instructed kitchen workers on how to serve meals and never instructed kitchen
workers regarding their use of utensils when preparing food.  *Id.*

---

[9] The sally-port corridor leads to the kitchen entrance and is monitored through a one-
way window in an internal ACO office.  *See* Tr. Day 1 (Mr. De Witt Lamar Long describing the
"middle," i.e., the sally-port corridor).

14.   As a preliminary matter, the court finds that although Sgt. Sugai had no official authority over the kitchen staff in relation to food matters, he possessed enough power and leverage over the line workers—who are indeed inmates under the supervision of ACOs—to direct their preparation of meals, if he chose to do so. *See id.* (Sgt. Rodney Sugai testifying that civilian staff oversee the kitchen-inmate workers but that he can override the civilian staff if there is "something of question" or something "of a security nature"); Tr. Day 2 (Mr. Lance Panui testifying that civilian kitchen staff work in partnership with ACOs but that the civilian staff ultimately takes directives from the Warden and the Deputy Warden, i.e., the top of the ACOs' "chain of command").

15.   Nevertheless, the weight of credible evidence supports the finding that Sgt. Sugai did not direct kitchen workers to sabotage Plaintiff's meal and, instead, that any cross-contamination between pork-based foods and Plaintiff's vegetarian foods was not attributable to Sgt. Sugai.  When asked whether he had ever instructed a kitchen worker on how to prepare Plaintiff's meals, Sgt. Sugai credibly answered, "absolutely not."  Tr. Day 1 (Sgt. Rodney Sugai).  Then-supervisory cook Lance Panui credibly testified that he never observed and was never made aware of an ACO instructing a kitchen worker on how to prepare a meal.  Tr. Day 2 (Mr. Lance Panui).  He also credibly testified that if he had observed an ACO instructing kitchen workers on food matters, he would have confronted the ACO

and made a note in his logbook (there was no such note).  *Id.*  Further, in a response to Plaintiff's second religious-diet request that Plaintiff filed after his pork-induced illness, program control administrator Gary Kaplan noted that Plaintiff's illness was caused by "the fact that the kitchen uses the same utensils for the vegetarian meal that they use to serve the pork," and Mr. Kaplan directed the food service manager to "ensure proper kosher protocol (separate pots, utensils, etc.) are followed."  Ex. J-28.  Mr. Kaplan's response thus characterized Plaintiff's illness as being caused by cross-contamination, not purposeful sabotage.  *See id.*

**D.    Plaintiff Being Forced to Eat in His Housing Unit**

16.    Starting around July 24, 2016—after the pork-contamination incident and after Plaintiff's related grievance against Sgt. Sugai—Plaintiff was occasionally forced to pick up his non-pork meal in the sally-port corridor and return to his housing unit to eat his meal.  Tr. Day 1 (Mr. De Witt Lamar Long); Ex. J-19 (step 2 grievance stating that Plaintiff was "bann[ed] from the dining room" and was forced to "pick up [his] meals in the [sally-port corridor] since the date of July 24, 2016"); *see* Tr. Day 1 (Sgt. Rodney Sugai testifying that he recalled sending Plaintiff to eat in his housing unit on a handful of occasions).

17.    Plaintiff testified that Sgt. Sugai was the one excluding Plaintiff from the cafeteria and forcing Plaintiff to eat in his housing unit.  Tr. Day 1 (Mr. De Witt Lamar Long); *see also* Ex. J-19 (blaming Sgt. Sugai for the cafeteria ban).

According to Plaintiff, Sgt. Sugai was implementing his own vindictive version of "meals to modules," a program normally reserved for inmates who suffer from physical or mental disabilities preventing them from walking to the cafeteria. *See* Tr. Day 1 (Mr. De Witt Lamar Long); Tr. Day 1 (Sgt. Rodney Sugai). Plaintiff testified—and other witnesses did not disagree—that he was not enrolled in the official "meals to module" program. *See* Tr. Day 1 (Mr. De Witt Lamar Long); Tr. Day 1 (Sgt. Rodney Sugai). And Plaintiff testified that he was subjected to Sgt. Sugai's version of "meals to module" for roughly six to eight months. Tr. Day 1 (Mr. De Witt Lamar Long).

18.    Sgt. Sugai credibly testified that he recalled sending Plaintiff to eat in Plaintiff's housing unit a "few times" and that he did so for security reasons, not out of vengeance. Tr. Day 1 (Sgt. Rodney Sugai). Specifically, Sgt. Sugai testified that Plaintiff was being "argumentative" and "disruptive" with the kitchen staff regarding the food service. *Id.* Sgt. Sugai thus made a security decision to separate Plaintiff from the kitchen staff by sending Plaintiff back to his housing unit. *See id.* Regarding Plaintiff's assertion that he was forced to eat in his housing unit for six to eight months, Sgt. Sugai responded, "absolutely not." *Id.* Sgt. Sugai estimated that he had to send Plaintiff back to his housing unit two to three times at most. *Id.*

14

19.     The court finds Sgt. Sugai's testimony more credible—Sgt. Sugai directed Plaintiff to eat in his housing unit only a handful of times, not for six to eight months, and Sgt. Sugai did so because of escalating conflicts between Plaintiff and the kitchen staff, not because of some vindictive motive.  That finding is supported by other evidence presented at trial:  Then-Chief of Security Lyle Antonio investigated Plaintiff's grievances, including by talking to Sgt. Sugai and witness Lieutenant Kent, and Chief Antonio found Plaintiff's grievances unsubstantiated.  Tr. Day 1 (Acting Warden Lyle Antonio testifying that although he did not remember exactly what Lt. Kent had to say about the grievances, he had advised her that she was obligated to write a report if something improper had occurred, and she declined to do so).  Further, in an October 27, 2016 response to one of Plaintiff's grievances, then-Warden Scott O. Harrington stated that an investigation had revealed that Plaintiff was "very demanding and verbally disrespectful towards [kitchen] staff at the time of [the] incident."  Ex. J-19 (response to the step 2 grievance in which Plaintiff blamed Sgt. Sugai for the purported cafeteria ban).

## E.     Smaller Portions or No Portions at All

20.     Plaintiff testified that in addition to Sgt. Sugai denying him non-pork meals in late 2015 through early 2016, Sgt. Sugai deprived of him of all food on at least three occasions between March 2016 and May 2017.  Tr. Day 1 (Mr. De Witt

Lamar Long); *see also* Ex. J-13 (step 1 grievance alleging that on July 23, 2016, "once again Sgt. Sugai sent me away without a meal"); Ex. J-14 (step 3 grievance following the step 1 grievance and asserting that "Sgt. Sugai . . . refused to give me my meal not just [on July 23, 2016] but other times").

21.    But that testimony was established to be false.  First, Sgt. Sugai credibly testified that he has never sent an inmate away from the cafeteria without a meal to which the inmate was entitled.  Tr. Day 1 (Sgt. Rodney Sugai).  And second, in a response to Plaintiff's step 3 grievance in which Plaintiff states that Sgt. Sugai refused him meals on multiple occasions, an Acting Institutions Division Administrator concluded that Plaintiff had simply refused to take the alternative vegetarian tray offered to him on the days a pork-based dish was being served.  *See* Ex. J-14; *see also* Ex. J-19 (response to Plaintiff's step 2 grievance, in which then-Warden Harrington noted that an investigation revealed that Plaintiff was "offered an alternative meal (vegetarian) but [he] refused and went back to [his] module").

22.    Plaintiff also testified that Sgt. Sugai at times directed kitchen-inmate workers to give Plaintiff smaller portions of food.  Tr. Day 1 (Mr. De Witt Lamar Long).  Plaintiff testified that he heard Sgt. Sugai direct kitchen staff to prepare Plaintiff "a special," which Plaintiff correlates to smaller portion sizes.  *See id.*

23.     But when held up against other evidence presented at trial, Plaintiff's testimony fails to establish that Sgt. Sugai directly or indirectly influenced the portion sizes provided to Plaintiff.  Sgt. Sugai credibly testified that he never instructed kitchen workers to adjust the portions served to an inmate.  *See* Tr. Day 1 (Sgt. Rodney Sugai).  Then-supervisory cook Lance Panui testified that ACOs are not involved in the plating of meals or portioning of dishes and that if he saw an ACO influencing a portion size, he would have corrected the ACO and made a note in his logbook (there was no such note).  Tr. Day 2 (Mr. Lance Panui).  And as for Plaintiff's supposition that "a special" was Sgt. Sugai's codeword for smaller portion size, the court finds it more likely that Sgt. Sugai was using "special" to describe Plaintiff's non-pork meal.  *Cf. supra* Part IV.A. (finding that either the supervisory cook *or the ACO* can verify that an inmate is on the meal-accommodations list).

**F.      Transfer to High Security Facility and the Lack of Religious Services**

24.     On May 8, 2017, after all of the events described above, including many of Plaintiff's grievances against Sgt. Sugai, Plaintiff was transferred from the medium-security facility to the high-security facility in HCF.  *See* Tr. Day 1 (Acting Warden Lyle Antonio); Ex. J-15.  That transfer disrupted Plaintiff's Islamic faith because he was unable to attend Friday Jumu'ah prayer services, which were being held in the medium-security facility but not in the high-security

facility.  *See* Tr. Day 1 (Mr. De Witt Lamar Long); Ex. J-16; *see also* Tr. Day 2 (then-assistant chaplain Alan Leigh testifying that he and the head chaplain had difficulty finding volunteers to conduct Islamic services, and that if there were no volunteers, there were no services).

25.     Then-Chief of Security Lyle Antonio was partially responsible for that transfer.  *See* Tr. Day 1 (Acting Warden Lyle Antonio).  Specifically, then-Warden Scott O. Harrington ordered that Sgt. Sugai and Plaintiff be segregated, and Chief Antonio carried out that order by transferring Plaintiff to the high-security facility and leaving Sgt. Sugai at his position in the medium-security facility.  *Id.*  The court finds that the transfer was not punitive in nature.  *See id.* (Acting Warden Lyle Antonio testifying that the purpose behind the transfer was to create a "cooling off period" between Sgt. Sugai and Plaintiff and to allow adequate time to investigate Plaintiff's grievances).  The court also finds Chief Antonio's decision to move Plaintiff instead of Sgt. Sugai to be supported by valid and rational reasoning—Chief Antonio testified that he had considered moving Sgt. Sugai but there were significant administrative roadblocks impeding his ability to move the Sergeant.  *Id.*  Chief Antonio specifically cited the contract-bargaining agreement that governed Sgt. Sugai's employment and how it required a staff investigation before Sgt. Sugai could be transferred; Chief Antonio described how there needed

to be corroboration of Plaintiff's harassment allegations in order to justify a staff investigation into and a transfer of Sgt. Sugai.  *See id.*

26.    After Plaintiff was transferred, he filed at least one grievance against Chief Antonio with respect to the lack of Jumu'ah prayer services in the high-security facility.  Tr. Day 1 (Mr. De Witt Lamar Long); *cf.* Ex. J-16 (step 2 grievance from Plaintiff stating that he had been unable to attend "Islamic services" since being transferred to high security) (responded to by then-Warden Harrington).  Plaintiff also filed an inmate request to attend Jumu'ah prayer services that was addressed to Chief Antonio.  Tr. Day 1 (Mr. De Witt Lamar Long).

27.    But Chief Antonio credibly testified that he had no ability as the Chief of Security to create or maintain religious services.  *See* Tr. Day 1 (Acting Warden Lyle Antonio).  He also credibly testified that he did not recall receiving a request from Plaintiff regarding Plaintiff's interest in attending Islamic services.  *See id.* And even if he had received such a request, he would have forwarded it to someone with authority to handle the request, such as the chaplain or the program control administrator.  *Id.*  Chief Antonio became involved with religious services only in relation to security matters.  *Id.*  The court finds that testimony to be credible and accurate.  *See* Tr. Day 2 (Mr. Alan Leigh testifying that as the then-assistant chaplain he worked in conjunction with the head chaplain to process

19

religious-service requests from inmates and to seek out religious practitioners who would volunteer to conduct the requested services).

28.     Chief Antonio also testified as to the infeasibility of transporting Plaintiff to the medium-security facility to attend that facility's Jumu'ah prayer services (while Plaintiff was being housed in the high-security facility). Specifically, Chief Antonio credibly testified that in order for Plaintiff to attend services in the medium-security facility, Plaintiff would need to be transported by vehicle[10] in full restraints and with a dispatch of security officers that would remain with Plaintiff while he attended the Jumu'ah service. *See id.* Chief Antonio testified that because of that personnel commitment, inmates in the high-security facility were not allowed to attend services in the medium-security facility, and vice versa. The court finds that testimony to be true and accurate.

## V.  CONCLUSIONS OF LAW

1.     No party disputes jurisdiction and/or venue. The court has jurisdiction over Plaintiff's § 1983 claims, and venue is proper because the relevant events occurred at HCF, which is located within the District of Hawaii.

---

[10] The medium-security facility and the high-security facility are in different buildings connected by a public road.  Tr. Day 1 (Acting Warden Lyle Antonio).

**A.      Free Exercise Claims Against Sgt. Sugai**

2.      The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The purpose of the "Free Exercise Clause" is to "secure religious liberty in the individual by prohibiting any invasions thereof by civil authority." *Schempp*, 374 U.S. at 223.  "[A] violation of the Free Exercise Clause is predicated on coercion . . . ." *Id.*

3.      "[T]he First Amendment's mandate that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof' has been made wholly applicable to the States by the Fourteenth Amendment." *Id.* at 215.  State actors can be liable in their individual capacity for damages on a free-exercise claim pursuant to 42 U.S.C. § 1983.  *See Orin v. Barclay*, 272 F.3d 1207, 1214 (9th Cir. 2001).

4.      Section 1983 provides that "[e]very person who, *under color of* any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  (emphasis added).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983

21

action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

5.     In the prison context, an inmate's right to freely exercise his or her religion is violated if: (1) the defendant substantially burdened the practice of the inmate's religion; and (2) the defendant did so without any justification reasonably related to legitimate penological interests. *See Shakur v. Schriro*, 514 F.3d 878, 884 (9th Cir. 2008).

6.     When applying the first element in a § 1983 case, the burden must have been caused by the individual defendant's action or inaction—"an affirmative act, participat[ing] in another's affirmative acts, or omit[ting] to perform an act which he is legally required to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).  The burdened religious belief need not be a mandatory or even central tenant of the inmate's religion.  *Shakur*, 514 F.3d at 884–885.  Rather, the inmate need only sincerely believe that the practice is consistent with his or her faith.  *Id.* (citing *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994), and *Callahan v. Woods*, 658 F.2d 679, 683 (9th Cir. 1981)).

7.     As to the second element, courts consider four factors under *Turner v. Safley*, 482 U.S. 78 (1987), to determine whether the burden imposed on an inmate's religious beliefs is reasonably related to a legitimate penological interest: "(1) Whether there is a 'valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it'; (2) Whether there are 'alternative means of exercising the right that remain open to prison inmates'; (3) Whether 'accommodation of the asserted constitutional right' will 'impact . . . guards and other inmates, and on the allocation of prison resources generally'; and (4) Whether there is an 'absence of ready alternatives' versus the 'existence of obvious, easy alternatives.'" *Shakur*, 514 F.3d at 884 (quoting *Turner*, 482 U.S. at 89–90); *see also Ward v. Walsh*, 1 F.3d 873, 877 (9th Cir. 1993).

8.     There are arguably four factual predicates for Plaintiff's free-exercise claim against Sgt. Sugai: (1) Sgt. Sugai allegedly denying Plaintiff non-pork meals in late 2015 through early 2016; (2) Sgt. Sugai allegedly directing kitchen workers to contaminate Plaintiff's meal with pork strands in February 2016; (3) Sgt. Sugai allegedly forcing Plaintiff to eat in his housing unit starting around July 24, 2016; and (4) Sgt. Sugai allegedly depriving Plaintiff of all food on some occasions, or directing kitchen workers to give Plaintiff smaller portions on other occasions, between March 2016 and May 2017.

23

9.     The court concludes that each of those alleged actions implicate Plaintiff's religious practice of eating a non-pork diet, a belief that is sincerely held by Plaintiff and that he views as consistent with Islamic dietary laws.

10.     The court also concludes that for each of those alleged actions, Sgt. Sugai was acting under the color of Hawaii law.  He exercised power that he possessed by virtue of laws governing Hawaii's correctional facilities, and his actions were made possibly only because of his position as an ACO at a correctional facility established under Hawaii law.

### (1)     Denials of non-pork meals

7.     For the first factual predicate, the court concludes that Plaintiff failed to meet his burden of showing that Sgt. Sugai acted or failed to act in a way that substantially burdened Plaintiff's religious practice of maintaining a non-pork diet. Put differently, Plaintiff has not established by a preponderance of the evidence that Sgt. Sugai was responsible for the denials of non-pork meals—rather, the evidence demonstrates that Sgt. Sugai was merely relaying the message that Plaintiff was not on the meal-accommodations list, a list that Sgt. Sugai neither compiled nor modified.  *See Davis v. State of California Dep't of Corr.*, 1996 WL 271001, at *49 (E.D. Cal. Feb. 23, 1996) ("While [the defendant's employee] does not make decisions on [State Compensation Insurance Fund ('SCIF')] claims, she does on occasion make a recommendation to SCIF. . . .  [Plaintiff] conceded at oral

argument that there is no evidence that [the employee] made such a recommendation in this case. . . .  The [defendant department] is not responsible for SCIF's actions.  Thus, there is no evidence that [defendant or its employee] took adverse action against [plaintiff] in relation to her SCIF claim."); *see also Coleman v. Bowden*, 797 F. App'x 422, 430 (11th Cir. 2019) (holding that the evidence "establishes that security staff assigned to the housing unit, like [defendant], are not responsible for cell assignments," and thus granting summary judgment to defendant because he "could not have caused the alleged adverse action").

### (2)     *Pork contamination incident*

8.     For the second factual predicate, the court again concludes that Plaintiff failed to meet his burden of showing that Sgt. Sugai took an action causing a substantial burden.  That is because the evidence presented at trial clearly established that Sgt. Sugai did not direct kitchen workers to sabotage Plaintiff's meal; rather, the evidence established that there was likely cross-contamination between pork-based foods and Plaintiff's vegetarian meal unattributable to Sgt. Sugai.

### (3)     *Plaintiff being forced to eat in his housing unit*

9.     For the third factual predicate, the court assumes that Sgt. Sugai took actions that substantially burdened Plaintiff's religious practice of maintaining a

non-pork diet—specifically, Sgt. Sugai ordered Plaintiff to eat his non-pork meals in isolation in his housing unit, separated from his fellow inmates, on at least a few occasions.

10.     But the court concludes that Sgt. Sugai's orders were justified and lawful.  Sgt. Sugai sent Plaintiff away from the cafeteria in order to deescalate conflicts between Plaintiff and the kitchen staff.  That justification is reasonably related to legitimate penological interests, as shown by the four *Turner* factors.

11.     Regarding the first factor, policy number COR.09.02.5.7 of the State of Hawaii's Department of Public Safety Corrections Administration Policy and Procedures Manual states that "[a]ll meals shall be served and eaten in the dining hall unless circumstances require the inmate(s) to be served in their respective housing units."[11]  The governmental interest behind that regulation is obviously security.  And maintaining security is the paramount concern in a prison environment, sometimes requiring the sacrifice of inmate comforts.  *See Bell v. Wolfish*, 441 U.S. 520, 545–46 (1979) ("Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."); *See Crime Just. & Am., Inc. v. Honea*, 876 F.3d 966, 975 (9th Cir. 2017) ("Maintaining security in a

---

[11] *Available at* https://dps.hawaii.gov/wp-content/uploads/2021/08/COR.09.02.pdf.

jail is inarguably a legitimate government interest."). The court finds that governmental interest to have a valid, rational connection to COR.09.02.5.7.

12. With respect to the second *Turner* factor, there were alternative means for Plaintiff to exercise his Islamic faith when being expelled from the cafeteria. Plaintiff was still able to eat his non-pork meal—and thus abide by his version of the halal diet—albeit alone in his housing unit. Although burdened by isolation, Plaintiff was nonetheless able to practice his religion through an alternative means that was reasonable under the given circumstances.

13. The reasonableness of that alternative exercise is revealed by the third *Turner* factor, which weighs even more in favor of Sgt. Sugai than the first two factors. Accommodating Plaintiff's right to maintain his religious diet without any restrictions—i.e., permitting him to eat non-pork meals in the cafeteria—would have impacted HCF staff and inmates (including Plaintiff) by threatening their safety and security. In that respect, credible evidence established that Plaintiff was being argumentative and disruptive with the kitchen staff, and that there was a significant threat of escalatory behavior that needed immediate attention.

14. The fourth and final *Turner* factor also demonstrates that Sgt. Sugai's actions were justified by legitimate penological interests. There were not any ready alternatives other than sending Plaintiff back to his housing unit. Sending the kitchen staff away was not an alternative, because they needed to prepare and

27

serve meals for the rest of HCF.  And although one might hope that Plaintiff's altercations could have been diffused without sending Plaintiff back to his housing unit, the court will not second-guess Sgt. Sugai's judgment as to the severity of and remedies to those altercations.  *See Beard v. Banks*, 548 U.S. 521, 529–30 (2006) (noting that courts must accord deference to the views of prison authorities as to "matters of professional judgment"); *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) ("In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.").

### (4)    *Smaller portions or no portions at all*

15.    For the fourth factual predicate, the court concludes that Plaintiff failed to meet his burden of showing that Sgt. Sugai took an action causing a substantial burden.  More specifically, Plaintiff has not established by a preponderance of the evidence that Sgt. Sugai sent Plaintiff away from the cafeteria without food or that Sgt. Sugai directed kitchen workers to adjust the portions on Plaintiff's meal trays.

## B.    Free Exercise Claims Against Chief Antonio

16.    The same legal standards recited above, concerning Plaintiff's free-exercise claim against Sgt. Sugai, also apply to Plaintiff's free-exercise claim against Chief Antonio.

17.     There are arguably two factual predicates for Plaintiff's free-exercise claim against Chief Antonio: (1) Chief Antonio allegedly transferring Plaintiff from the medium-security facility to the high-security facility, which was known to lack Islamic prayer services; and (2) Chief Antonio allegedly failing to act on Plaintiff's request for Islamic services in the high-security facility.  *See supra* Part IV.F.

18.     The court concludes that each of those alleged actions implicate Plaintiff's religious practice of attending Jumu'ah prayer services, a belief sincerely held by Plaintiff and consistent with his Islamic faith.

19.     The court also concludes that for each of those alleged actions, Chief Antonio was acting under the color of Hawaii law.  He exercised power that he possessed by virtue of laws governing Hawaii's correctional facilities, and his actions were made possibly only because of his position as Chief of Security at a correctional facility established under Hawaii law.

### (1)     *Transfer to the high-security facility*

20.     For the first factual predicate, the court assumes that Chief Antonio took an action that substantially burdened Plaintiff's religious practice of attending Jumu'ah prayer services—specifically, Chief Antonio transferred Plaintiff to the high-security facility, where there were no Islamic prayer services.

29

21.     But the court concludes that Chief Antonio took that action with a lawful justification:  Chief Antonio's reason for transferring Plaintiff to high security—to bring down tensions between Plaintiff and Sgt. Sugai—is reasonably related to a legitimate penological interest, as shown by three of the four *Turner* factors.

22.     Regarding the first factor, policy number COR.18.01.3.2a of the State of Hawaii's Department of Public Safety Corrections Administration Policy and Procedures Manual states that "[i]nmates may be segregated on a temporary basis from the general inmate population . . . when their continued presence in general population presents an immediate threat to the safety of self or others, jeopardizes the integrity of an investigation . . . , or endangers institutional security."  Ex. J-77. The governmental interests behind that regulation—institutional security and integrity of investigations—are due significant deference.  *See Thornburgh*, 490 U.S. at 413; *Honea*, 876 F.3d at 975; *Ware v. Nelson*, 1998 WL 154585, at *3 (D. Kan. Mar. 20, 1998) ("Confiscation of [a religious item] was reasonably related to the legitimate governmental interest of investigating the alleged assault committed by the plaintiff . . . .").  The court finds those governmental interests to have a valid, rational connection to COR.18.01.3.2a.

23.     Unlike the first *Turner* factor, the second factor weighs against Chief Antonio.  That is because there were no alternative means for Plaintiff to exercise

30

his religious practice of attending Jumu'ah prayer services given that those prayer services must be held in congregation and that HCF has near-absolute control over the assembly of inmates in its high-security facility. *Cf. O'Lone v. Est. of Shabazz*, 482 U.S. 342, 351 (1987) ("There are, of course, no alternative means of attending Jumu'ah; respondents' religious beliefs insist that it occur at a particular time. But the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service.").

24.    But the third *Turner* factor weighs strongly in favor of Chief Antonio's transfer of Plaintiff being lawful. If Chief Antonio would have left Plaintiff in the medium-security facility where Jumu'ah prayer services were capable of being held and where Plaintiff was attending those services, there would have been a significant impact on institutional security given the rising tensions between Sgt. Sugai and Plaintiff. Alternatively, if Chief Antonio would have transferred Sgt. Sugai instead of Plaintiff, HCF would have needed to dedicate resources to comply with the union rules governing the transfer of an ACO— assuming there were even adequate grounds to force a transfer Sgt. Sugai—further delaying the separation of Plaintiff from Sgt. Sugai and thus also threatening institutional security.

25.     The fourth and final factor also weighs in favor of Chief Antonio's transfer.  There was no ready alternative to transferring Plaintiff to high security.  Transferring Sgt. Sugai was not practical, as explained above.  And transporting Plaintiff from the high-security facility to the medium-security facility in order to attend Jumu'ah prayer services in the medium-security facility was also not practical given the required personnel commitments.

### (2)     *Lack of Islamic services in the high-security facility*

26.     For the second factual predicate, Plaintiff appears to claim that Chief Antonio created a substantial burden on Plaintiff by transferring him to high security and, thereafter, by failing to take action to remedy that burden.  But even if inaction could violate the Free Exercise Clause, the court concludes that Plaintiff failed to establish by a preponderance of the evidence that Chief Antonio was responsible for handling Plaintiff's request to attend religious services in the high-security facility.  Credible evidence established that if Chief Antonio had received such a request from Plaintiff, he would have forwarded it to someone with authority to handle the request, such as the chaplain or the program control administrator.  He would have not—and could have not—taken any action on that request as the Chief of Security.  Plaintiff thus failed to meet his burden on the "action or inaction" element.  *See Duffy*, 588 F.2d at 743.

32

27.    In short, as to Plaintiff's claim that the lack of Jumu'ah prayer services in high security constituted a free-exercise violation, Plaintiff has asserted that claim against the wrong individual.  The court takes no position on whether other HCF employees besides Chief Antonio should have better handled Plaintiff's request.  The court merely holds that handling that request—and, more generally, coordinating religious services—is not within the required duties of this Chief of Security.

## C.    Retaliation Claims Against Sgt. Sugai

28.    "[A]s an aspect of the unconstitutional conditions doctrine[,] a claim for retaliation can be based upon the theory that the government imposed a burden on the plaintiff, more generally, 'because he exercise[d] a constitutional right.'" *Blaisdell*, 729 F.3d at 1242 (quoting *Regan v. Tax'n with Representation of Washington*, 461 U.S. 540, 545 (1983)).  Such rights include the First Amendment right to freedom of speech, *see Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012), and the First Amendment right to freely exercise one's religion, *see Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1289 (11th Cir. 2012) (analyzing "Free Exercise Retaliation" claim).  Both of those rights are incorporated into the Fourteenth Amendment and are thus protected against infringement by state governments.  *See Schempp*, 374 U.S. at 216 n.8 (noting that freedom of speech is protected by the due process clause of the Fourteenth

Amendment); *id.* at 223 (noting that the right to freely exercise religion is wholly applicable to the states through the Fourteenth Amendment).

29.     Individual state actors can be liable for damages on a First Amendment retaliation claim pursuant to 42 U.S.C. § 1983.  *See Blaisdell*, 729 F.3d 1237 (analyzing but ultimately rejecting a pro se prisoner's retaliation claim against as state-prison official under § 1983).  Of course, to be liable in his or her individual capacity, the state actor must be acting under color of state law when committing the retaliation.  *See* 42 U.S.C. § 1983.

30.     "Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005).

31.     The court concludes that Plaintiff participated in protected activity by filing grievances against Sgt. Sugai.  The court also concludes that Plaintiff participated in protected activity by resubmitting his religious-diet request to confirm his accommodation for non-pork meals (contrary to the alleged denials of non-pork meals by Sgt. Sugai).  *See Holt v. Hobbs*, 574 U.S. 352, 361 (2015) ("Here, the religious exercise at issue is [a Muslim inmate's] growing of a beard

34

. . . ."); *Blaisdell*, 729 F.3d at 1242 ("[A] claim for retaliation can be based upon the theory that the government imposed a burden on the plaintiff, more generally, because he exercise[d] a constitutional right." (citation and internal quotation marks omitted)); *id.* (noting that First Amendment retaliation claims are not limited to the bases of the freedom of speech and the freedom of association).

32.    Subsequent to that protected activity, Sgt. Sugai allegedly took three actions that could be viewed as retaliatory; hence, there are arguably three factual predicates for Plaintiff's retaliation claim against Sgt. Sugai: (1) Sgt. Sugai allegedly directing kitchen workers to contaminate Plaintiff's meal tray with pork strands in February 2016; (2) Sgt. Sugai allegedly forcing Plaintiff to eat in his housing unit starting around July 24, 2016; and (3) Sgt. Sugai allegedly depriving Plaintiff of all food on some occasions, or directing kitchen workers to give Plaintiff smaller portions on other occasions, between March 2016 and May 2017. *See supra* Parts IV.C–E.

33.    The court concludes that for each of those alleged actions, Sgt. Sugai was acting under the color of Hawaii law.  He exercised power that he possessed by virtue of laws governing Hawaii's correctional facilities, and his actions were made possibly only because of his position as an ACO at a correctional facility established under Hawaii law.

34.     But based on the Conclusions stated above, Plaintiff's retaliation claims must fail.  For the first and third factual predicates, Plaintiff has failed to meet his burden of showing that Sgt. Sugai took an adverse action.  *See supra* Parts V.A.(2) & (4).  And for the second factual predicate, although Plaintiff has shown that Sgt. Sugai took adverse actions by ordering him to eat in his housing unit on multiple occasions, those actions clearly advanced legitimate correctional goals.  *See supra* Part V.A.(3) (analyzing the *Turner* factors and conclude that Sgt. Sugai's orders were "reasonably related to legitimate penological interests").

## VI.  **DECISION**

Thus, following the completion of the bench trial in this case, and in accordance with the foregoing Findings and Conclusions, the court finds and concludes that Plaintiff has failed to prove his free-exercise and retaliation claims against Defendants.  From the court's perspective, this case appears to be a classic example of the false-cause fallacy, where Plaintiff's link between a premise (his feuding with Sgt. Sugai) and a conclusion (Sgt. Sugai is responsible for my suffering) depends on an imagined causal connection that does not, in fact, exist.  Plaintiff has endured an unfortunate series of circumstances—mistaken denial of religious meals, and a cross-contamination-induced illness, to name a few—and it was only human nature for Plaintiff to attribute those circumstances to an authority

figure with which Plaintiff has quarreled and that has verbally irritated Plaintiff in the past. *See, e.g.*, Ex. J-25 (grievance in which Plaintiff alleges that Sgt. Sugai yelled at him with profanities and called him a "crybaby"). In that regard, the court cautions Sgt. Sugai and other correctional officers that surly insults only contribute more to the imagined casual connections. Even if sometimes necessary, correctional officers should be judicious in what might be perceived as hostile treatment of inmates, lest they invite more lawsuits by those inmates.

Judgment shall issue in favor of Defendants, and the court ORDERS the Clerk of Court to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 21, 2022.



/s/ J. Michael Seabright
J. Michael Seabright
Chief United States District Judge

*Long v. Sugai et al.*, Civ. No. 19-00235 JMS-RT, Findings of Fact and Conclusions of Law